[L. A. No. 12925. In Bank.—September 25, 1931.]

JOHN M. RICHARDSON et al., Appellants, v. H. S. CALLAHAN et al., Defendants; W. J. COLTER, Respondent.

William W. Fry for Appellants.

McAdoo, Neblett, O'Connor & Clagett, McAdoo, Neblett & Clagett and J. F. T. O'Connor for Respondent.

PRESTON, J.—Action by plaintiffs, as successors in interest of certain lessors in a conveyance known as an oil and gas lease, to compel the assignee of the lessee thereunder to comply with a covenant therein to keep the premises free from liens arising from drilling and producing operations under said instrument. The question arose by the sustaining of respondent's demurrer to the complaint without leave to amend. The facts, therefore, are not in dispute and the single proposition is presented as to whether the

rules of equity will authorize relief. The prayer of the complaint is for damages, it is true, but the complaint itself will support equitable relief.

The lease in question is but the so-called ordinary oil and gas indenture authorizing the exploration for and the production, if found, of oil and gas upon the demised lands. Under the provisions of the Civil Code and the decisions of this court, such an instrument is more than a mere usufructuary lease; it is a property right in the nature of a servitude or chattel real at common law, which may be held and enjoyed as an estate for years or perpetually during production. (Civ. Code, sec. 819; *Graciosa Oil Co.* v. *Santa Barbara*, 155 Cal. 140 [20 L. R. A. (N. S.) 211, 99 Pac. 483]; *Brookshire Oil Co.* v. *Casmalia, Ranch O. & D. Co.*, 156 Cal. 211 [103 Pac. 927]; *Mohawk Oil Co.* v. *Hopkins*, 196 Cal. 148 [236 Pac. 133]; *County of Ventura* v. *Barry*, 207 Cal. 189 [277 Pac. 333]; *People* v. *Associated Oil Co.*, 211 Cal. 93 [294 Pac. 717].) For a recent learned discussion of the nature and characteristics of such a lease see the opinion of Mr. Justice Marks of the District Court of Appeal in *Stone* v. *City of Los Angeles*, 114 Cal. App. 192 [299 Pac. 838].

It should be noted also that here oil in commercial quantities had been found and the well or wells were at the times in question on production. It is plain, therefore, that there is a privity of estate between the plaintiff herein and the assignee of the lessee. Moreover, this particular lease was made outright to the "lessee, his successors and assigns", and it provided in this connection: "The lessee shall have the right, without the consent of the owner, to assign this lease, in whole or in part, or sub-let any part of the leased land. In which event the lessee shall be automatically released from all obligations thereafter accruing under this indenture."

Coming to the immediate basis for this controversy, the lease provided: "The lessee shall not suffer or permit any laborer or materialmen's lien, or liens of like nature, to arise or exist upon or against the leased land, by reason of his operation under this indenture, and shall hold the owner harmless against any and all such liens. . . . All provisions, covenants, agreements and stipulations contained in this indenture, by which either of the parties hereto are

bound, shall in like manner be binding upon the heirs, successors and assigns, of the parties so bound; and those which are for the benefit of either of the parties, shall in like manner inure to the benefit of the heirs, successors and assigns of the parties so benefited; and all of such provisions, covenants, agreements and stipulations shall run with the land.''

The lease was executed November 14, 1925. In December, 1925, one Playter, the original lessee, became indebted to the Union Tank and Pipe Company in the sum of $3,529.50 for oil-well casing used in drilling on said property. On May 4, 1926, said claim became a mechanic's lien upon the property, after having been duly filed as such. On May 5, 1926, the original lessors executed a deed to these plaintiffs, which was delivered on May 24th following. On April 2, 1926, however, and prior to the filing of said claim of lien, said Playter assigned the lease to respondent W. J. Colter. Later said lien claim was reduced to a judgment which the real property was sold to satisfy. But prior to the expiration of the period for redemption this action was initiated and, as above noted, we may treat it as an action to compel redemption from said lien or for reimbursement if plaintiffs should themselves redeem the land.

The matter is now reduced to the sole question of whether or not respondent Colter must respect the covenant above noted to protect the property from liens. It is true that the indebtedness arose under Playter but it is also a fact that the lien did not arise until a month or more after Colter had received the assignment and entered into possession of the property thereunder. It is also noticeable that under the terms of the lease, Playter, following the assignment, was released from all liability so that the obligation became one for Colter to comply with or else plaintiffs are without redress.

We entertain no doubt that the covenant to keep the premises free from liens of their own making, binds not only the lessee but his assignees as well. Respondent's position, however, in this connection is: ''That said complaint does not state facts sufficient to constitute a cause of action against the defendant W. J. Colter, in that the said W. J. Colter, in accepting a naked assignment of the lease set forth in the complaint, did not thereby become bound by

the terms of said written lease.'' This contention he attempts to support by a reliance upon sections 1461, 1462 and 1463 of the Civil Code, which read in part as follows (sec. 1461): ''The only covenants which run with the land are those specified in this title, and those which are incidental thereto.'' (Title III of said code.) Section 1462 describes generally such covenants as follows: ''Every covenant contained in a grant of an estate in real property, which is made for the direct benefit of the property, or some part of it then in existence, runs with the land.'' Section 1463 provides: ''The last section (1462) includes covenants 'of warranty', 'for quiet enjoyment', or for further assurance on the part of a grantor, and covenants for the payment of rent, or of taxes or assessments upon the land, on the part of a grantee.'' From these statutes respondent deduces the conclusion that the covenant to keep the servient tenement free from liens is a mere personal covenant not running with the land and hence not binding upon the assignee unless specially covenanted for by him, citing in that connection *Realty & Rebuilding Co.* v. *Rea*, 184 Cal. 565, 569 [194 Pac. 1024, 1026], as follows: ''An occupant of real property who holds by virtue of a bare assignment of the lease and without entering into any contract, either with his assignor or the lessor, affirmatively binding himself to fulfill the covenants of the lease, is subject only to such obligations as he impliedly assumes by entry and taking possession of the leased premises.''

We are of the opinion that two successful and effective answers may be made to this contention. First, that the covenant in question does run with the land and, second, that whether it does or not, equity will enforce it against respondent under well-settled and repeated holdings of this court.

The marked tendency of our decisions seems to be to disregard the question of whether the covenant does or does not run with the land and to place the conclusion upon the broad ground that the assignee took with knowledge of the covenant and it was of such a nature that when the intention of the parties coupled with the result of a failure to enforce it was considered, equity could not in conscience withhold relief. To this class of holding belong the following, among many other cases: *Hunt* v. *Jones*, 149 Cal.

297 [86 Pac. 686]; *Bryan* v. *Grosse,* 155 Cal. 132 [99 Pac. 499]; *Stanislaus Water Co.* v. *Bachman,* 152 Cal. 716 [15 L. R. A. (N. S.) 359, 93 Pac. 858]; *Henrici* v. *South Feather etc. Co.,* 177 Cal. 442 [170 Pac. 1135]; *Wayt* v. *Patee,* 205 Cal. 46 [269 Pac. 660]; *Relovich* v. *Stuart,* 211 Cal. 422 [295 Pac. 819]. These cases rest largely upon the doctrine stated by Mr. Pomeroy (Pomeroy's Eq. Jur., 2d ed., secs. 688, 689), as follows: "On the same principle, if the owner of land enters into a covenant concerning the land, concerning its uses, subjecting it to easements or personal servitudes and the · like, and the land is afterwards conveyed or sold to one who has notice of the covenants, the grantee or purchaser will take the premises bound by the covenant, and will be compelled in equity either to specifically execute it, or will be restrained from violating it; and it makes no difference whatever with respect to this liability in equity whether the covenant is or is not one which 'in law runs with the land'." The doctrine is stated in *Whitney* v. *Union Ry. Co.,* 11 Gray (Mass.), 359 [71 Am. Dec. 715], as follows: "The precise form of the nature of the covenant or agreement is quite immaterial. It is not essential that it should run with the land. A personal covenant or agreement will be held valid and binding in equity on a purchaser taking the estate with notice. It is not binding upon him merely because he stands as an assignee of the party who makes the agreement, but because he has taken the estate with notice of a valid agreement concerning it which he cannot equitably refuse to perform." These citations are quite sufficient to direct the course and result of this appeal.

But we think where it is clear that the covenant does run with the land it is better that it be so declared. Under section 1462 a covenant to run with the land must be of "direct benefit to the property". Where a servitude only is created by the instrument in question, any covenant that will protect the title of the servient tenement would seem clearly to be a direct benefit to it. We are at a loss to know why a covenant to protect it from liens of the owner of the servitude is not for the direct benefit of the property out of which it is carved.

The illustrations given in section 1463 of three instances of such covenants on the part of the grantor and two on the part of the grantee are by no means intended to be ex-

clusive or all-inclusive, but within the definition in section 1462 of said Civil Code many others may and do exist. For example, covenants to insure, to repair, to deliver up possession, to renew a lease, to exercise an option to purchase, to restrict alienation, to develop mineral resources on a royalty basis, are all such as run with the land. (7 R. C. L., p. 1106, sec. 22; Supp., vol. 3, p. 2139; 1931 Supp., p. 327.) In California as early as *Laffan* v. *Naglee,* 9 Cal. 662, 675 [70 Am. Dec. 678], a covenant was held to run with the land, which read in substance:

"If the lessor chooses, at any time hereafter, to sell, and should offer the property for sale, on such terms as she may choose, lessee may have the liberty of buying it, in preference to any one else."

In *Coburn* v. *Goodall,* 72 Cal. 498 [1 Am. St. Rep. 75, 14 Pac. 190, 193], an action for damages for breach of a covenant to surrender demised premises with improvements thereon at the expiration of the term, the court, in holding the covenant to be one running with the land, said: "It is claimed that these four defendants, if liable at all under the covenant to surrender (which is denied), are liable only in respect of their privity of estate, and that such liability is several and proportionate to the interest acquired by each of them. To this proposition we cannot assent. There are some authorities to that effect, but the weight of opinion, we believe, is contrary thereto, and with better reason it is held that while assignees of a lease hold as tenants in common, they are jointly and severally liable on covenants to repair and to deliver up at the end of the term. These covenants which are connected with the estate, run with the land, and vest in point of benefit and liability in the assignee, while the personal privity of contract between the lessors and lessee remains unaffected by the transfer. (Citing many cases.)"

In *Standard Oil Co.* v. *Slye,* 164 Cal. 435, 442 [129 Pac. 589, 591], a covenant for a renewal of an oil lease was held to run with the land and the court there said: "Plaintiff's position is that such a covenant as the one here considered is not made for the benefit of the property, but, on the contrary, is an injurious limitation upon the lessor's power of repossession. Even if this position were correct the plaintiff would be bound in conscience to fulfill the cove-

nant. (*Bryan* v. *Grosse,* 155 Cal. 135 [99 Pac. 499].) But it was a covenant running with the land, and by purchasing the interest of the Independence Oil Company and accepting rent from the claimants under the Harper lease plaintiff placed itself in privity of estate with them. This covenant, running as it did with the land, was binding upon one holding in privity of estate with the assignee of the lessor.''

The more recent case of *Sacramento S. F. L. Co.* v. *Whaley,* 50 Cal. App. 125, 130 [194 Pac. 1054, 1056], seems to be exactly in point. There a mortgagor exacted a covenant from a mortgagee to release from the operation of the lien of the mortgage, subdivisions of property amounting to as much as ten acres or more upon the payment on the mortgage of $125 per acre for each acre sought to be released. This agreement was held binding upon subsequent encumbrancers of the property on the ground that such covenant was a direct benefit to the owner of the property mortgaged and ran with it. In construing the above-quoted sections of the code, the court said: ''We do not understand that that phrase or expression, as it is used in section 1462, was intended to be or is restricted in its meaning to such *physical* benefit only as may directly accrue to the land from the covenant, but that it means also any covenant which affects the title to real property or any interest or estate therein of the covenant. A covenant made for the direct benefit of the land is one which is intended to restore to the covenantee or the owner of the land some right with respect thereto which he has parted with *pro re nata* or for a special purpose. It is, in other words, a covenant for the direct benefit of the estate or interest of the covenantee in the land mortgaged. (*Standard Oil Co.* v. *Slye,* 164 Cal. 435, 442 [129 Pac. 589].) While, under the statutory law of this state a mortgage does not vest in the mortgagee an estate or interest in the mortgaged land, yet the mortgage affects the mortgagor's title. A covenant in a mortgage providing for the removal of the lien of the mortgage from certain specified portions of the land mortgaged is a covenant for the unfettering, *pro tanto,* of the title, and is, therefore for the direct benefit of the land.''

Finally, Mr. Washburn, in his work on Real Property, volume 2, section 1205, states the rule as follows: "Such covenants, and such only, run with the land as concern the land itself, in whosesoever hands it may be, and become united with, and form a part of, the consideration for which the land, or some interest in it, is parted with, between the covenantor and covenantee."

Basing our conclusion upon a deduction from the definitions given in said statutes, supported by the above authority, we hold a covenant by the lessee in an ordinary oil and gas lease, to keep the property free from liens due to operations on the property demised, is binding upon his assignee and this is particularly true where, as here, the operations have resulted in the discovery of oil and the lien is allowed to accrue during the period of production.

The judgment is reversed with directions to overrule the demurrer and to permit, if thought advisable, amended or supplemented pleadings.

Seawell, J., Shenk, J., Curtis, J., Richards, J., and Waste, C. J., concurred.